**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DEANDRE CRAWFORD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No: 1:18-cv-04882 |
| v. | ) | |
| | ) | Hon. Mary M. Rowland |
| CHARLES BEST, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S RESPONSE TO THE WEXFORD DEFENDANTS' RULE 56.1
STATEMENT OF UNDISPUTED MATERIAL FACTS AND PLAINTIFF'S LOCAL
RULE 56.1 STATEMENT OF ADDITIONAL FACTS IN OPPOSITION TO SUMMARY
JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1(b)(3), Plaintiff

DeAndre Crawford hereby responds to defendant Aguinaldo's, defendant Obaisi's, and

defendant Diaz's (collectively, the "Wexford Defendants") Rule 56.1 Statement of Material

Facts. ECF No. 129. To the extent Crawford admits that certain facts are undisputed, he does so

for the limited purpose of responding to the Wexford Defendants' instant motion for summary

judgment. Crawford's responses to the Wexford Defendants' statement of facts shall not be

construed as judicial admissions or otherwise binding on Crawford at trial or in connection with

any other proceedings in this case. Furthermore, Crawford's failure to dispute a fact shall not be

construed as an admission that the fact is "material" for purposes of deciding the Wexford

Defendants' motion for summary judgment.

**RESPONSES TO THE WEXFORD DEFENDANTS' RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS**

1.    Plaintiff, DeAndre Crawford ("Plaintiff" or "Mr. Crawford"), is an inmate in the custody of the Illinois Department of Corrections ("IDOC"). During all relevant times of this action, he was housed at Stateville Correctional Center ("Stateville"). (*See* Exhibit 1 – Plaintiff's Complaint (ECF #5) at ¶ 1; Exhibit 2 – Deposition Transcript of DeAndre Crawford at 12:1-17).Dr. Obaisi served as a physician and Medical Director of Stateville. (Exhibit 1 at ¶ 21).

**Response:** Undisputed.

2.    Dr. Aguinaldo is a staff physician working at Stateville. (Exhibit 1 at ¶ 22; and Exhibit 3 – Deposition Transcript of Evaristo Aguinaldo, M.D., at 18:11-19).

**Response:** Undisputed.

3.    Nurse Diaz is employed as a nurse at Stateville. (Exhibit 1 at ¶ 23; and Exhibit 4 – Deposition Transcript of Lidia Diaz, at 18:9-19:9).

**Response:** Undisputed.

4.    On August 19, 2014, Mr. Crawford presented for an evaluation with Dr. Obaisi in connection with complaints of neck and left shoulder pain that he attributed to a May 14, 2014 fall off of his top bunk. Upon examination, Mr. Crawford's neck and shoulder were found to have normal strength and motion, and it was noted he was ambulating well. As such, he was diagnosed with a shoulder and neck sprain, and prescribed Naprosyn 500mg for 30 days. Naprosyn in a non-steroidal anti-inflammatory drug ("NSAID") that is often used to treat musculoskeletal pain. (Exhibit 5 - Plaintiff's IDOC Medical records at page 1; Exhibit 6 - Expert Report of Dr. Chadwick Prodromos at page 2; and, Exhibit 7 - Expert Report of Dr. Vincent Cannestra at ¶ 7).

**Response:** Undisputed.

6.    On September 29, 2014, Mr. Crawford reported that he again fell out of his bunk as a result of a seizure. He complained of pain in his right shoulder, neck, lower back, and hips. Upon examination, he demonstrated full range of motion in his arms and neck. He was provided analgesic balm. (Exhibit 5 at page 2; Exhibit 6 at page 2; and, Exhibit 7 at ¶ 8).

**Response:** Undisputed.

7.    On January 28, 2015, Plaintiff presented for an evaluation with Dr. Obaisi in connection with complaints of pain in his trapezius muscle, amongst other complaints. Upon examination, there were no structural objective findings. Dr. Obaisi diagnosed his condition as a trapezius strain, and prescribed him Mobic, a NSAID. (Exhibit 5 at page 3; Exhibit 6 at pages 23; and, Exhibit 7 at ¶ 9).

**Response:** The cited record evidence does not establish that Dr. Obaisi provided the care described in Paragraph 7. Otherwise, Crawford does not dispute Paragraph 7.

8.      On July 25, 2015, Mr. Crawford attended an evaluation with a nurse in connection with complaints of back pain "for the last few days." The nurse noted that she did not observe any pain with movement. The nurse provided him with Ibuprofen and advised him to restrict his physical activities for a few days. (Exhibit 5 at page 4; Exhibit 6 at page 3; and, Exhibit 7 at ¶ 10).

**Response:** Undisputed.

9.      On January 24, 2016, Mr. Crawford attended a nurse sick call appointment in connection with complaints of a "dull pain" in his left shoulder that he claimed resulted from a "wheelchair incident" one year prior. The nurse noted that her examination demonstrated his function was within his normal limits and that there was no significant loss of function. The nurse prescribed Tylenol for three days. (Exhibit 5 at page 5; Exhibit 6 at page 3; and, Exhibit 7 at ¶ 11).

**Response:** Undisputed.

10.      On March 30, 2016, Mr. Crawford returned for a nurse sick call appointment in connection with complaints of left shoulder pain. He described it has sharp and intermittent. Upon examination, there was no bruising, swelling, or other obvious abnormality noted.. The nurse referred Mr. Crawford to Physician's Assistant, LaTanya Williams ("PA Williams"). (Exhibit 5 at page 6; Exhibit 6 at page 3; and, Exhibit 7 at ¶ 12).

**Response:** Undisputed.

11.      Mr. Crawford's evaluation with PA Williams occurred on April 1, 2016. Upon examination, PA Williams noted discomfort of the shoulder with motion. She assessed Mr. Crawford's condition as "probably bursitis." As such, she prescribed Naprosyn 500mg for two months, analgesic balm, and heat to the affected area. (Exhibit 5 at page 7; Exhibit 6 at page 3; and, Exhibit 7 at ¶ 12).

**Response:** Undisputed.

12.      On May 19, 2016, Mr. Crawford returned for a follow-up visit with PA Williams, at which time he complained of continued shoulder pain. Ms. Williams discontinued the Naprosyn and prescribed him Mobic 7.5mg for one month; as well as Robaxin 500mg (muscle relaxer) for seven days. In addition, she ordered an X-ray of the left shoulder, which was taken on June 8, 2016. The results of the X-ray were negative for any severe bone or joint pathology. (Exhibit 5 at pages 8-9; Exhibit 6 at page 3; and, Exhibit 7 at ¶ 14-15).

**Response:** Undisputed.

13.      On June 10, 2016, Mr. Crawford attended an evaluation with a Nurse Practitioner in connection with complaints of left shoulder pain. Upon examination, Mr. Crawford

demonstrated full range of motion of the shoulder and normal strength. The Nurse Practitioner assessed his condition as chronic rotator cuff tendonitis. The Nurse Practitioner provided instruction to Mr. Crawford regarding a home exercise pain and prescribed sixty tablets of Tylenol. (Exhibit 5 at page 10; Exhibit 6 at page 4; and, Exhibit 7 at ¶ 16).

**Response:** Undisputed.

14. On July 8, 2016, Plaintiff refused a nurse sick call appointment with Nurse Diaz. He signed a refusal form. He also presented for nurse sick call with Nurse Diaz on July 9, 2016, at which time he advised her "I just told you yesterday, I didn't sign up." (Exhibit 5 at pages 11-12).On July 10, 2016, Mr. Crawford attended a nurse sick call appointment in connection with complaints of shoulder pain. Upon examination, there was no swelling or bruising. The nurse prescribed ibuprofen for three days. Because she was unable to conduct a full examination due to security restrictions, the nurse scheduled Mr. Crawford for an evaluation with PA Williams on July 13, 2016. (Exhibit 5 at page 13; Exhibit 6 at page 4; and, Exhibit 7 at  16).

**Response:** Undisputed.

16. On July 12, 2016, Plaintiff's prescription for 60 tablets of Tylenol was renewed. (Exhibit 5 at page 14; Exhibit 7 at page 5, fn. 2).

**Response:** Undisputed. However, further responding, Crawford states that he had been

prescribed Tylenol previously and had informed prison medical staff that it was not effective at

relieving his orthopedic pain.[1]

17. On July 12, 2016, an IDOC tactical team performed a shakedown of Plaintiff's cell. (Exhibit 1 at ¶ 63).

**Response:** Undisputed.

18. According to Plaintiff, his mattress was removed from his cell during the July 12, 2016 shakedown. (Exhibit 1 at ¶ 64).

**Response:** Undisputed. Further responding, Crawford states that the fact that his

mattress was removed is not subject to genuine dispute. Between July 12, 2016 and July 29,

2016, Crawford submitted seven separate grievances explaining that his mattress had been

removed and never replaced. In its response to Crawford's grievances, IDOC did not dispute

---

[1] Ex. 6, Cannestra Rpt. ¶ 12.

that Crawford's mattress had been removed on July 12, 2016 and was not replaced until July 29, 2016.[2]

19.     Plaintiff notified multiple members of the IDOC correctional staff regarding not having a mattress and requested that it be replaced. (Exhibit 1 at ¶¶ 65-100; Exhibit 2 at 126:6-127:24, 133:1-23, 135:1-19).

**Response:** Undisputed.

20.     Plaintiff alleges that he was offered a mattress on July 20, 2016, but that he refused it due to its poor condition. (Exhibit 1 at ¶ 85).

**Response:** Undisputed. Further responding, Crawford states that the mattress IDOC offered him on July 20, 2016 was "badly soiled" and "soaked through with urine and blood."[3]

21.     Plaintiff alleges that he slept on a hard steel bed frame for seventeen days until he received a suitable replacement mattress on July 29, 2016 (Exhibit 1 at ¶¶ 101-103).

**Response:** Undisputed.

23.     On July 13, 2016, Mr. Crawford presented for an evaluation with PA Williams in connection with complaints of shoulder pain stemming from a fall from his top bunk two years prior. Notably, it was not recorded in the progress note that Mr. Crawford reported that his mattress had been removed the day prior. Upon examination, there were no acute changes since the last examination. PA Williams prescribed Mobic 7.5mg for one month and referred him to the physician's sick call. (Exhibit 5 at page 15; Exhibit 6 at page 4; and, Exhibit 7 at ¶ 22).

**Response:** Undisputed.

24.     On July 15, 2016, Mr. Crawford attended an evaluation with Dr. Aguinaldo in connection with complaints of shoulder pain that began two years ago. Notably, it was not recorded in the progress note that Mr. Crawford reported that his mattress had been removed three days prior. Upon examination, there was slight pain with range of motion, but no stiffness. Dr. Aguinaldo instructed Mr. Crawford to continue taking his previously prescribed medications, advised him regarding a home exercise plan, and advised him to follow-up in five weeks. (Exhibit 3 at 65:23-69:3; Exhibit 5 at page 16; Exhibit 6 at pages 4-5; and, Exhibit 7 at ¶ 23).

**Response:** Undisputed. Further answering, Crawford states that defendant Aguinaldo recommended that Crawford continue to take the Mobic that he had been prescribed on July 12,

---

[2] Ex. 4, Grievance Materials, at 1-14.
[3] Ex. 1, Complaint ¶ 85.

2016.[4]  However, the prison pharmacy had refused to fill this prescription because of potentially dangerous interactions with Crawford's other medications.[5]  Crawford further states that he informed defendant Aguinaldo that he was experiencing pain attributable to the fact that he did not have a mattress.[6]

25.     On July 17, 2016 and July 20, 2016, Plaintiff presented for a nurse sick call with Nurse Diaz in connection with complaints that he did not receive his Mobic prescribed by PA Williams on July 13, 2016. On both occasions, Nurse Diaz resubmitted the prescription order written on July 13, 2016 to the pharmacy so that it would be filled. Notably, it was not recorded in the progress note that Mr. Crawford reported that his mattress had been removed on July 12, 2016. (Exhibit 4 at 100:19-107:20; Exhibit 5 at page 17; Exhibit 6 at page 5; and, Exhibit 7 at ¶¶ 24-25).

**Response:** Disputed. Crawford attended sick call on July 17, 2016 and July 20, 2016 to obtain treatment for pain in his back, hips, and shoulders, which he attributed to not having a mattress.[7]  Defendant Diaz did not provide Crawford any treatment for these injuries, nor did she attempt to get Crawford a mattress.[8]  Instead, Diaz simply resubmitted Crawford's prescription for Mobic, which had been written on July 12, 2016, but was never filled.[9]  Defendant Diaz did not conduct any inquiry into why the prescription was not filled.[10]

26.     On July 21, 2016, Ms. Williams generated a note that stated that the pharmacy advised her that there was a potential for a negative reaction between Mobic and another drug he was prescribed, Lithium. As such, she cancelled the prescription to Mobic arranged for Mr. Crawford to be seen by Dr. Obaisi. (Exhibit 5 at page 18; Exhibit 6 at page 5; and, Exhibit 7 at ¶ 26).
**Response:** Undisputed.

27.     On July 28, 2016, Mr. Crawford attended an evaluation with Dr. Obaisi in connection with complaints of intermittent shoulder pain for the past two years. Notably, it was not recorded in the progress note that Mr. Crawford reported that his mattress had been removed

---

[4] Ex. 5, Medical Records, at 27.
[5] Ex. 5, Medical Records, at 35.
[6] Ex. 2, Crawford Decl. ¶ 5.
[7] Ex. 1, Complaint ¶¶ 102-106, 256-265; Ex. 4, Grievance Materials, at 3, 7; Ex. 2, Crawford Decl. ¶ 5.
[8] Ex. 1, Complaint ¶¶ 102-106, 256-265; Ex. 4, Grievance Materials, at 3, 7; Ex. 3, Crawford Dep. 40:20-42:22.
[9] Ex. 5, Medical Records, at 25; Ex. 6, Cannestra Rpt. ¶¶ 24-25.
[10] Ex. 5, Medical Records, at 25.

on July 12, 2016. Upon examination, he observed tenderness to the long head of the brachial left biceps. As such, Dr. Obaisi administered an intramuscular injection of Depomedrol 40mg to theleft shoulder, which is a steroid used to treat muscle inflammation. (Exhibit 5 at pages 19-20; Exhibit 6 at page 5; and, Exhibit 7 at ¶ 28).

**Response:** Disputed. Crawford's complaints were not limited to his pre-existing shoulder pain. At the July 28, 2016 appointment with defendant Obaisi, Crawford sought treatment for pain in his back, hips, and shoulders, which he attributed to being forced to sleep on a steel bedframe for over two weeks.[11] Defendant Obaisi did not provide Crawford any treatment for his back pain or hip pain and Dr. Obaisi did not make any effort to get Crawford a mattress.[12]

27. Over the next several weeks, Mr. Crawford was seen on several occasion by various medical providers in connection with complaints of urinary symptoms. The medical records do not contain any complaints of pain in his shoulder, back, neck, or hips during those appointments. (Exhibit 5 at pages 21-26; Exhibit 6 at page 5).

**Response:** Disputed. Crawford's complaints over the "several weeks" following his July 28, 2016 appointment were not limited to urinary symptoms. On August 23, 2016, August 29, 2016, and September 8, 2016, Crawford sought treatment for the pain in his back, hips, and shoulders attributable to having been forced to sleep on a bare steel bedframe for 17 consecutive days.[13]

28. On August 29, 2016, Mr. Crawford presented for an evaluation with Dr. Obaisi in connection with complaints of pain in his shoulder, hips, and lower back as a result of fall that occurred "several days ago" due to a seizure. Mr. Crawford requested a medical permit for a waist chain. Upon examination, Dr. Obaisi noted there were no acute changes. Dr. Obaisi ordered an X-ray of the lumbar spine and Mobic 7.5mg for seven days. In addition, he ordered laboratory testing for rheumatoid arthritis, sedimentation rate, and C-reactive. (Exhibit 5 at pages 27; Exhibit 6 at page 5; and, Exhibit 7 at ¶ 33).

---

[11] Ex. 1, Complaint ¶¶ 266-276; Ex. 2, Crawford Decl. ¶ 5; Ex. 6, Cannestra Rpt. ¶¶ 19-21.
[12] Ex. 1 Complaint ¶¶ 266-276; Ex. 5, Medical Records, at 29; Ex. 6, Cannestra Rpt. ¶ 28.
[13] Ex. 6, Cannestra Rpt. ¶¶ 31-33; Ex. 5, Medical Records, at 41-44.

6

**Response:** The cited record evidence does not state that Crawford attributed the pain in his shoulder, hips, and lower back to the seizure he experienced several days prior to his appointment. Otherwise, Crawford does not dispute Paragraph 28.

29. On September 8, 2016, Mr. Crawford attended a nurse sick call evaluation with Nurse Diaz. Mr. Crawford inquired regarding when his X-Ray and labs ordered by Dr. Obaisi were going to take place. Nurse Diaz advised Plaintiff that he was on the list for these procedures, and he would be called when it was his turn. (Exhibit 5 at page 28; Exhibit 6 at pages 5-6; and, Exhibit 7 at ¶ 33).

**Response:** Undisputed.

30. The X-ray was performed on September 12, 2016. The results were negative for bone or joint pathology. (Exhibit 5 at page 29; Exhibit 6 at page 6; and, Exhibit 7 at ¶ 33).

**Response:** Undisputed.

31. In addition, the laboratory testing result for rheumatoid arthritis, sedimentation rate, and C-reactive, which were taken on September 13, 2016, were all within normal limits. (Exhibit 5 at page 30; Exhibit 6 at page 6; and, Exhibit 7 at ¶ 33).

**Response:** Undisputed.

32. Plaintiff refused nurse sick call with Nurse Diaz on October 4, 2016. (Exhibit 5 at page 31).

**Response:** Undisputed.

33. On December 20, 2016, Mr. Crawford underwent an examination with Dr. Aguinaldo in connection with complaints of hip pain. The physician ordered an X-ray of the hip and lumbar spine, both of which were negative for any pathology. (Exhibit 5 at pages 32-33; Exhibit 6 at page 6; and, Exhibit 7 at ¶ 34).

**Response:** Undisputed.

34. Mr. Crawford returned for a follow-up evaluation with Dr. Aguinaldo on January 5, 2017 for a follow up of his radiographs. Dr. Aguinaldo noted no pathology according to the X-ray report and directed Mr. Crawford to follow-up on an as needed basis. (Exhibit 5 at page 34; Exhibit 6 at page 6; and, Exhibit 7 at ¶ 34).

**Response:** Undisputed.

35. On January 29, 2018, Plaintiff presented for an evaluation with PA Williams complaining of shoulder pain that occurred during a 2014 fall from his top bunk, as well as a

myriad of other medical complaints. PA Williams prescribed Indocin for eight weeks, ordered an X-ray of the left shoulder, and referred Plaintiff to physical therapy. (Exhibit 5 at pages 35-36).

      **Response:** Undisputed.

      36.    An X-ray of the left shoulder and right wrist were performed on January 31, 2018. Both were negative for pathology. (Exhibit 5 at page 37).

      **Response:** Undisputed.

      37.    Plaintiff underwent physical therapy for his left shoulder from February 23, 2018 to April 10, 2018. (Exhibit 5 at pages 38-41).

      **Response:** Undisputed.

      38.    Plaintiff retained orthopaedic surgeon, Vincent Cannestra, M.D., as a medical expert. (Exhibit 7).

      **Response:** Undisputed.

      39.    The entirety of Dr. Cannestra's opinions are, *verbatim,* as follows:

- Based on the above medical records, it is my opinion that Mr. Crawford had aggravation of his pre-existing orthopedic conditions from sleeping without a mattress for 17 days.

- It is clear that he had substantial and significant pre-existing problems, including chronic low back pain, bilateral shoulder pain, and bilateral hip pain. The records show that he had these complaints since at least 2014. However, it is my opinion that these conditions were soft tissue in nature and were certainly exacerbated by sleeping without a bed mattress for 17 days in a row. After Mr. Crawford was forced to sleep on the steel bed frame, the medical records indicate that his complaints increased in both frequency and severity, particularly with respect to his hips, back, and neck. This suggests aggravation of his prior conditions. The medical staff ordered x- rays of multiple body parts and treatments with multiple anti-inflammatory medications, muscle relaxants, and topical creams. Additionally, in regards to his chronic left shoulder pain, he received a cortisone injection for his left biceps tendinitis. The timing of these various additional attempts to treat Mr. Crawford is evidence that his conditions were aggravated due to the manner in which he was forced to sleep.

- It is my opinion that the aggravation of Mr. Crawford's conditions was due to the stress and strain he experienced as a result of being forced to sleep on the steel bedframe for a period of 17 days. It is generally accepted among orthopedists that there is a relationship between musculoskeletal pain and sleep posture and/or sleep conditions. For example, for many individuals with lower back pain, a lateral (on one's side) or supine (lying flat on one's back) sleeping position may be less painful. However, such positions would be

difficult to sustain throughout the sleep cycle for individual forced to lie on a steel bed frame.

- It is my opinion that, if the medical staff was aware that Mr. Crawford did not have a mattress to sleep upon, then the medical staff bore some responsibility in ensuring that Mr. Crawford received a mattress in a timely fashion to address his multiple orthopedic soft tissue complaints. It was incumbent upon the medical staff to make multiple attempts to assure that Mr. Crawford had a mattress to sleep upon so as to limit the worsening of his orthopedic conditions if they had known that he had no mattress and if Mr. Crawford voiced complaints to them about its impact on his health or pain.

- By the correctional facility's own acknowledgement in their response to Mr. Crawford's grievances, Mr. Crawford went 17 days without a bed mattress, which, in my opinion, led to an unacceptable, unreasonable, unnecessary, and prolonged aggravation of his pre-existing orthopedic conditions. (Exhibit 7 at ¶¶ 36-40)

**Response:** Crawford does not dispute that Dr. Cannestra offers the opinions set forth in

Paragraph 39. However, Crawford states that Dr. Cannestra's opinions are supplemented,

clarified, and elaborated upon by his sworn deposition testimony.[14]

40. Defendants retained Chadwick Prodromos, M.D. ("Dr. Prodromos"), as their medical expert. Dr. Prodromos is a licensed medical physician in the State of Illinois and board certified in Orthopaedic Surgery. He has specialized in orthopaedic surgery for over 30 years since his fellowship in this area in 1985 at Harvard. Throughout the past 30 years, he has performed thousands of orthopaedic procedures. In addition, he has also managed non-operative treatment for patients with a wide range of orthopaedic issues. Moreover, he has supervised nurses in both a hospital and clinical settings. (Exhibit 6 at page 6).

**Response:** Undisputed.

41. Dr. Prodromos is of the opinion that based upon Mr. Crawford's subjective reporting of his symptoms, the clinical findings noted upon examination, and lack of findings on X-ray and laboratory testing, Mr. Crawford has mild to moderate, non-specific, orthopaedic discomfort of his back, shoulder, neck, and hips. Specifically, he has rotator cuff tendinitis and a back strain. These conditions are caused by inflammation of the muscles, tendons, and joints. The standard course of treatment for these types of injury include NSAIDs, intramuscular steroid injections, topical analgesics, muscle relaxers, reduction of certain activity, and an at-home exercise plan as advised by a medical provider. All of these therapies were provided, or at least offered, to Mr. Crawford by Dr. Obaisi, Dr. Aguinaldo, and the rest of the Stateville medical staff. These conditions do not require surgical evaluation; but instead, should be managed with symptomatic non-operative treatment. Dr. Prodromos is of the opinion that the timing and nature of the treatment provided by Dr. Obaisi, Dr. Aguinaldo, and the Stateville medical staff to

---

[14] *See, e.g.*, Ex. 7, Cannestra Dep. 59:17-61:24, 63:24-64:12.

Plaintiff's conditions were reasonable, compassionate, and well within the community standard of care. (Exhibit 6 at pages 6-7).

**Response:** Crawford does not dispute that the Wexford Defendants' expert, Dr. Chadwick Prodromos, offers the opinions set forth in Paragraph 41. However, Crawford disputes Dr. Prodromos's opinion that the "timing and nature of the treatment provided by Dr. Obaisi, Dr. Aguinaldo, and the Stateville medical staff to Plaintiff's conditions were reasonable, compassionate, and well within the community standard of care." As Crawford's expert, Dr. Vincent Cannestra, explains, the Wexford Defendants had a duty to make "multiple attempts" to obtain Crawford a mattress.[15] Furthermore, Crawford states that defendant Diaz's refusal to provide Crawford any treatment and her efforts to interfere with Crawford's ability to request medical attention fell below the community standard of care.[16]

42. Furthermore, Dr. Prodromos is of the opinion that, presuming that Mr. Crawford's claim that he slept on a metal bed frame for seventeen days because he did not have a mattress is true, this would only produce temporary but not long-lasting exacerbations of these problems. Moreover, this would certainly not cause any permanent injury or structural defect. In any event, Dr. Obaisi, Dr. Aguinaldo, and the medical staff at Stateville treated these issues with numerous modalities, both topical and medicinal. This course of treatment was compassionate and well within the standard of care. (Exhibit 6 at page 7).

**Response:** Crawford does not dispute that Dr. Prodromos offers the opinion that sleeping on a bare steel bedframe would "only produce temporary but not long-lasting exacerbations" of Crawford's conditions and would not "cause any permanent injury or structural defect." However, further answering, Crawford states that Dr. Prodromos does not dispute Crawford's claim that sleeping on a bare steel bedframe caused him various orthopedic injuries and significant pain.[17]

43. Moreover, Dr. Prodromos is of the opinion that Nurse Diaz addressed Plaintiff's medical needs by making referrals to physicians and mid-level practitioners; as well as facilitated

---

[15] Ex. 6, Cannestra Rpt. ¶ 39.
[16] Ex. 1, Complaint ¶¶ 256-265.
[17] Ex. 9, Prodromos Rpt., at 7.

10

treatment that was ordered by these providers. Based upon the scope of her licensure, she cannot prescribe medications or provide other treatment that falls under the purview of a doctor or mid-level practitioner. Moreover, to the extent that Mr. Crawford frequently refused nurse sick call appointments with her, it obviously impacted her ability to address his medical needs. (Exhibit 6 at page 7).

**Response:** Crawford does not dispute that Dr. Prodromos offers the opinions described in Paragraph 43. Crawford also does not dispute that defendant Diaz made referrals to other practitioners, facilitated treatment that other providers ordered, and was limited in the type of care she could provide. However, Crawford does dispute Dr. Prodromos's opinions that defendant Diaz addressed Crawford's medical needs and that Crawford's refusal of sick call appointments impacted defendant Diaz's ability to address Crawford's medical needs. Crawford states that defendant Diaz refused to provide him ***any*** treatment and ***interfered with*** his ability to obtain medical attention.[18] Defendant Diaz also failed to provide him appropriate care when she failed to make any effort to obtain a mattress for him. Finally, Crawford states that his refusal of nurse sick call appointments did not impact defendant Diaz's ability to address his medical needs.[19] The only time Crawford refused nurse sick call appointments with Nurse Diaz was when he was mistakenly taken to sick call appointments that he did not request in the first place.[20] Moreover, each of these refusals occurred before Crawford sustained the injuries attributable to sleeping on a bare steel bedframe, so his refusals could not have impacted defendant Diaz's ability to treat the injuries at issue in this case.[21]

44. Plaintiff testified that he has no knowledge as to whether Dr. Obaisi, Dr. Aguinaldo, or Nurse Diaz reviewed any of his grievances while he was at Stateville. (Exhibit 2 at 22:12-23:2).

**Response:** Undisputed.

---

[18] Ex. 3, Crawford Dep. 40:20-42:13.
[19] Ex. 6, Cannestra Rpt. ¶ 37.
[20] Ex. 5, Medical Records, at 23 (noting that Crawford refused sick call appointments on July 8 and 9 because he "didn't sign up").
[21] Ex. 5, Medical Records, at 23 (stating that Crawford refused sick call appointments on July 8-9, 2016).

45.    Dr. Aguinaldo testified that he is not responsible for or involved in providing mattresses to inmates. (Exhibit 3 at 89:5-8).

**Response:** Undisputed.

46.    Nurse Diaz testified that nurses cannot prescribe medication. Instead, if a patient needs a prescription, the nurse refers the patient to a physician who will see the patient and treat them accordingly. (Exhibit 4 at 85:5-86:3).

**Response:** Undisputed.

47.    Dr. Cannestra testified that he does not know whether medical staff has the authority to provide a Stateville inmate with a mattress. (Exhibit 8 – Deposition Transcript of Vincent Cannestra, M.D., at 64:13-17).

**Response:** Undisputed.

49.    Dr. Cannestra testified that he does not know the process in which an inmate requests a mattress from staff members at Stateville (Exhibit 8 at 64:19-22).

**Response:** Undisputed.

50.    Maurice Lake ("Major Lake") is employed as a Major at Stateville Correctional Center. (Exhibit 9 - Deposition of Maurice Lake at 12:2-8).

**Response:** Undisputed.

51.    Major Lake was designated by the IDOC as a corporate representative pursuant to Fed. R. Civ. P. 30(b)(6) to testify regarding the following topics: 1) "The process by which inmates can request replacement mattresses, bedding, blankets, or other essentials related to the conditions of their confinement."; and, 2) "The processes or protocols correctional officers are expected to follow if they are informed by an inmate of issues related to the inmate's conditions of confinement, including issues related to plumbing or the lack of appropriate bedding." (Exhibit 9 at 10:5-13).

**Response:** Undisputed.

52.    Major Lake testified that if an inmate has a mattress removed from his cell during a shakedown, the process to obtain a new one is for the inmate to notify the gallery officer or the sergeant, who will then notify a lieutenant who will arrange for that inmate to receive a replacement mattress. This will take place on the same shift. (Exhibit 9 at 20:8-21:4).

**Response:** Undisputed.

53.    Major Lake testified that medical staff do not have the ability to replace an inmate's mattress. (Exhibit 9 at 31:3-6).

**Response:** Undisputed.

54.    Major Lake testified that medical staff do not have any involvement in replacing an inmate's mattress. (Exhibit 9 at 31:16-20).

**Response:** Crawford does not dispute that medical staff generally does not have any involvement in replacing inmates' mattresses. However, further responding, Crawford states that Major Lake did not testify that medical staff are unable to request a mattress on an inmate's behalf. Nor did Major Lake testify that IDOC would have refused to provide Crawford a mattress had medical staff submitted such a request to IDOC on Crawford's behalf.[22]

55.    Major Lake testified that the responsibility of replacing inmate mattresses falls solely on IDOC personnel. (Exhibit 9 at 31:16-23).

**Response:** Crawford does not dispute that Major Lake testified that IDOC is responsible for replacing inmate mattresses. However, Crawford states that Major Lake did not testify that medical staff may not request that IDOC provide an inmate a mattress. Nor did Major Lake testify that IDOC would have refused or been unable to provide Crawford a mattress had medical staff submitted such a request to IDOC on Crawford's behalf.

56.    Major Lake testified that if a nurse was notified by an inmate they did not have a mattress, all the nurse could do was notify the gallery officer, the sergeant, or the lieutenant of this issue. (Exhibit 9 at 33:15-20).

**Response:** Crawford does not dispute that Major Lake testified that if a nurse knew an inmate did not have a mattress, all the nurse could do was notify the gallery officer, the sergeant, or the lieutenant of this issue. However, further responding, Crawford states that, in addition to notifying IDOC staff of the issue, prison medical staff could ***request*** that IDOC provide the inmate a replacement mattress and could ***explain*** why a suitable mattress is a medical necessity for an inmate with a history of orthopedic conditions.[23]

---

[22] Ex. 8, Lake Dep. 32:7-34:20.
[23] Ex. 8, Lake Dep. 32:7-21; Ex. 7, Cannestra Dep. 63:24-64:11.

56.     Dan Artl ("Commander Artl") is employed as the Region 1 Commander of the Special Operations Unit for the IDOC. His job duties include supervising the activities of the tactical unit. (Exhibit 10 – Deposition Transcript of Dan Artl at 4:5-7; 11:1-4).

**Response:** Undisputed.

57.     Commander Artl was designated by the IDOC as a corporate representative pursuant to Fed. R. Civ. P. 30(b)(6) to testify regarding several topics. (Exhibit 10 at 8:15-23)

**Response:** Undisputed.

58.     Commander Artl testified that after the July 12, 2016 shakedown at issue, he was one of the supervisors that walked the gallery to ensure that all inmates had mattresses in their cells prior to leaving. (Exhibit 10 at 54:18-55:16).

**Response:** Undisputed.

59.     Commander Artl testified that medical personnel are not involved in determining when a tactical operation takes place, the purpose of the tactical operation, or the nature of the search of an inmate's living quarters during a tactical operation. (Exhibit 10 at 70:9-17).

**Response:** Undisputed.

60.     Commander Artl testified that medical personnel are not involved in returning mattresses to offenders after a tactical operation. Instead, it is the responsibility of the tactical team to ensure that inmates have a mattress before leaving the living quarters. (Exhibit 10 at 72:6-16).

**Response:** Undisputed.

## PLAINTIFF'S LOCAL RULE 56.1 STATEMENT OF ADDITIONAL FACTS REQUIRING DENIAL OF SUMMARY JUDGMENT

Pursuant to L.R. 56.1(b), Crawford sets forth the following additional facts requiring denial of summary judgment:

### Crawford Was Forced to Sleep on a Steel Bedframe for 17 Consecutive Days

1.      On July 12, 2016, IDOC's "Orange Crush" tactical team performed a facility-wide shakedown of Stateville.[24]

2.      During the shakedown, Crawford's mattress and bedding was removed from his cell, leaving Crawford to sleep on a bare steel bedframe.[25]

3.      Crawford repeatedly requested a replacement mattress, but he did not receive a usable replacement until July 29, 2016.[26]

4.      Sleeping on a bare steel bedframe for 17 consecutive days caused Crawford significant pain and discomfort.  The manner in which Crawford was forced to sleep also exacerbated Crawford's pre-existing orthopedic conditions.[27]

5.      Crawford complained of pain in his back, hips, and shoulders soon after his mattress was removed.[28]

6.      Crawford submitted seven grievances to prison officials over the 17 day period he was without a mattress.[29]  Four of these grievances explained that being without a mattress was causing him significant pain that the prison's medical provider, Wexford Health Services, refused to treat.  In these four grievances Crawford stated as follows:

---

[24] Ex. 1, Complaint ¶¶ 63-64.
[25] Ex. 1, Complaint ¶¶ 63-64.
[26] Ex. 1, Complaint ¶¶ 63-101; Ex. 4, Grievance Materials, at 1-2.
[27] Ex. 6, Cannestra Rpt. ¶¶ 36-38; Ex. 10, Prodromos Dep. 66:11-68:17 (agreeing with Cannestra opinion that Crawford's conditions were "exacerbated by sleeping without a bed mattress for 17 days in a row").
[28] Ex. 4, Grievance Materials, at 3-7 (describing pain as early as July 17, 2016).
[29] Ex. 4, Grievance Materials, at 3-14.

- July 17, 2016 (Grievance No. 2845): Crawford states that he has been without a mattress since July 12, 2016. Crawford further states, "sleeping on steel has cause[d] a sharp shooting pain in my back, and pain in my hips and shoulders." With respect to the relief sought, Crawford explicitly requests medical care.[30]

- July 18, 2016 (Grievance No. 2932): Crawford again requests a mattress and complains that he is "experiencing pain in [his] back, shoulder and hips."[31]

- July 20, 2016 (Grievance No. 3088): Crawford states that he is still without a mattress. He also writes, "[h]aving to sleep on the bare steel is causing my hips, back and both shoulders severe pain." He further states that he was "seen but not treated by [defendant Lydia Diaz R.N.]." Crawford explicitly states that the lack of treatment constitutes deliberate indifference to his medical needs. In addition to requesting a mattress, Crawford requests that the prison provide him "medical treatment for [his] hips, back and both shoulders."[32]

- July 23, 2016 (Grievance No. 3166): Crawford again states that he is "having extreme pain in [his] hips, shoulder, and back." With respect to the relief sought, he again requested "medical treatment for [his] back, hips and shoulder."[33]

7.     Stateville's grievance officer denied all of Crawford's grievances because he eventually received a mattress on July 29, 2016.[34]  The Chief Administrative Officer concurred in this decision and denied Crawford's grievances on August 11, 2016.[35]

---

[30] Ex. 4, Grievance Materials, at 7.
[31] Ex. 4, Grievance Materials, at 7.
[32] Ex. 4, Grievance Materials, at 5.
[33] Ex. 4, Grievance Materials, at 3.
[34] Ex. 4, Grievance Materials, at 1-2.
[35] Ex. 4, Grievance Materials, at 2.

16

8.      Stateville's grievance officers did not address Crawford's complaints regarding Wexford's medical care (or lack thereof) other than directing Crawford to raise his complaints with the health services unit.[36]

**The Wexford Defendants Failed to Assist Crawford with Obtaining a Mattress**

9.      Crawford sought medical attention from defendants Obaisi, Aguinaldo, and Diaz on multiple occasions for the pain caused by being forced to sleep on the steel bedframe without a mattress.[37]

10.     During Crawford's interactions with the Wexford Defendants regarding the pain in his back, hips, and shoulders Crawford informed them that the pain was attributable to the fact that his mattress had been taken and that he was being forced to sleep on a bare steel bedframe.[38]

11.     Crawford specifically recalls informing defendant Diaz that his pain was attributable to the fact that his mattress had been removed and that he was being forced to sleep on a bare steel bedframe. This conversation occurred at Crawford's cell and defendant Diaz was able to see that Crawford's mattress had indeed been removed.[39]

12.     As part of their examinations, the Wexford Defendants would have asked Crawford about the cause of his pain. Indeed, the Stateville Correctional Center treatment protocol for muscle strain and joint pain includes asking the offender what caused the injury.[40]

13.     The Wexford Defendants were aware of the fact that Crawford had various pre-existing orthopedic conditions that could be exacerbated and cause significant pain if Crawford

---

[36] Ex. 4, Grievance Materials, at 1.
[37] Ex. 1, Complaint, ¶ 103-112; Ex. 5, Medical Records, at 25-37 (documenting multiple interactions and appointments with prison medical staff); Ex. 6, Cannestra Rpt. ¶¶ 19-21.
[38] Ex. 1, Complaint, ¶¶ 107, 259, 269; Ex. 2, Crawford Decl. ¶¶ 5-6.
[39] Ex. 2, Crawford Decl. ¶ 5; Ex. 8, Lake Dep. 34:11-22.
[40] Ex. 5, Medical Records, at 24.

was forced to sleep on a steel bedframe for an extended period of time. These pre-existing orthopedic conditions are well-documented in Crawford's medical records.[41]

14. Crawford's pre-existing conditions included pain in his shoulder, neck, hips, and back. Crawford's medical records suggest that this pain began in May 2014 after he fell from his top bunk during a grand mal seizure.[42]

15. Although Crawford's pre-existing shoulder pain was relatively constant, his neck, hip, and back pain was more intermittent before his mattress was taken. The medical records indicate that July 25, 2015 was the last time before the removal of his mattress in which he sought treatment for back pain and that September 24, 2014 was the last time before the removal of his mattress in which he sought treatment for neck or hip pain.[43]

16. None of the Wexford Defendants made any effort to assist Crawford in obtaining a replacement mattress from IDOC prison staff. The Wexford Defendants did not request that IDOC prison staff replace Crawford's mattress; nor did they explain to IDOC that an appropriate mattress was a medical necessity for Crawford given his well-documented orthopedic conditions.[44]

17. Although matters related to the conditions of inmates' confinement are generally the responsibility of IDOC staff, prison medical staff had the ability to request that IDOC alter the conditions of inmates' confinement when such changes were deemed medically necessary.[45] Prison medical staff could request, for example, that an inmate receive a bottom bunk, that an

---

[41] Ex. 6, Cannestra Rpt. ¶¶ 6-18; Ex. 2, Crawford Decl. ¶ 7.
[42] Ex. 6, Cannestra Rpt. ¶¶ 6-7.
[43] Ex. 6, Cannestra Rpt. ¶¶ 8-9; Ex. 7, Cannestra Dep. 59:17-61:24.
[44] Ex. 6, Cannestra Rpt. ¶¶ 19-29, 39; Ex. 7, Cannestra Dep. 46:10-47:14, 61:10-24.
[45] Ex. 5, Medical Records, at 49-53 (Medical Permits) Ex. 8, Lake Dep. 29:17-33:6.

inmate be held on a low galley, that only certain types of restraints be used on an inmate, or that an inmate be given two mattresses instead of just one. IDOC did accommodate these requests.[46]

18.     Replacing Crawford's mattress would have provided Crawford significant relief from the pain he was experiencing over the 17 day period he was forced to sleep on a bare steel bedframe and would have prevented any further exacerbation of Crawford's pre-existing conditions. Crawford's expert, Dr. Vincent Cannestra, opines that in light of this potential solution, the prison medical staff had an obligation to "make multiple attempts" to obtain him a mattress from IDOC prison officials.[47]

**The Wexford Defendants Prescribed Crawford Inappropriate Medication**

19.     On July 13, 2016, a physician's assistant employed by Wexford prescribed Crawford Mobic (meloxicam) as a pain reliever.[48]

20.     The prison's pharmacy refused to fill Crawford's prescription for Mobic because of a potentially harmful interaction between Mobic and lithium, which Crawford was also taking at the time.[49]

21.     On July 15, 2016, Crawford was examined by defendant Aguinaldo. Defendant Aguinaldo recommended that Crawford take the Mobic he had been prescribed by the physician's assistant two days earlier.[50]  However, as of the July 15, 2016 appointment, Crawford had not received the Mobic.[51]

---

[46] Ex. 5, Medical Records, at 49-53 (Medical Permits); Ex. 8, Lake Dep. 29:17-33:6; Ex. 7, Cannestra Dep. 63:24-64:11.
[47] Ex. 6, Cannestra Rpt. ¶¶ 38-40; Ex. 7, Cannestra Dep. 61:10-24.
[48] Ex. 5, Medical Records, at 31.
[49] Ex. 5, Medical Records, at 32; Ex. 9, Prodromos Rpt., at 5.
[50] Ex. 5, Medical Records, at 27, 35.
[51] Ex. 5, Medical Records, at 25 (July 17, 2016 appointment noting that Crawford still had not received prescription for Mobic).

22.     On July 17, 2016, Crawford told defendant Diaz that he had been prescribed Mobic at his July 13, 2016 appointment, but that he had yet to receive the medication. Defendant Diaz did not attempt to contact the prison pharmacy to inquire as to why the prescription had not been filled; instead, defendant Diaz simply resubmitted the same prescription.[52]

23.     On July 20, 2016, Crawford saw defendant Diaz again and told her that he still had not received the Mobic he had been prescribed.[53] Defendant Diaz again did not attempt to contact the prison pharmacy or otherwise investigate the reason why the prescription had not been filled. She just resubmitted the prescription to the pharmacy, which the pharmacy again refused to fill.

24.     On July 21, 2016, a physician's assistant employed by Wexford learned that the pharmacy was refusing to fill Crawford's prescription for Mobic because of the risk of a harmful interaction between it and the lithium Crawford was taking at the time.[54] The physician's assistant cancelled Crawford's prescription for Mobic and made an appointment for him to see defendant Obaisi on July 28, 2016.[55]

25.     At his appointment with defendant Obaisi on July 28, 2016, defendant Obaisi administered a steroid injection to Crawford's left shoulder, but did not treat the pain in Crawford's neck, back, or hips. Defendant Obaisi also did not prescribe a different type of pain medication for Crawford in place of the Mobic.[56]

### Defendant Diaz Refused to Provide Crawford Any Medical Care

[52] Ex. 5, Medical Records, at 25 (noting that Crawford had not received Mobic and resubmitting prescription to pharmacy); Ex. 9, Prodromos Rpt., at 5; Ex. 11, Diaz Dep. 100:19-107:18.
[53] Ex. 5, Medical Records, at 25 (noting that Crawford had not received Mobic and resubmitting prescription to pharmacy); Ex. 9, Prodromos Rpt., at 5.
[54] Ex. 5, Medical Records, at 32; Ex. 9, Prodromos Rpt., at 5.
[55] Ex. 5, Medical Records, at 32; Ex. 9, Prodromos Rpt., at 5.
[56] Ex. 6, Cannestra Rpt. ¶¶ 27-28.

26.      On July 17, 2016, Crawford presented himself at sick call in an effort to obtain some relief for the pain he was experiencing as a result of having been forced to sleep on a bare steel bedframe for the previous 5 nights. Crawford was seen by defendant Diaz.[57]

27.      Crawford told defendant Diaz that he was in pain because of the manner in which he was being forced to sleep.[58]  However, defendant Diaz did not attempt to treat Crawford's pain, claiming that there was nothing she could do to help him.[59] As Crawford stated in the grievance related to this incident, defendant Diaz "put him out" of sick call without providing any treatment.[60]

28.      At some point between the July 17, 2016 interaction with defendant Diaz and when Crawford's mattress was returned on July 29, 2016, Crawford again requested to attend sick call in another effort to obtain some relief for the pain he was in as a result of having to continue to sleep on a bare steel bedframe.[61]  However, defendant Diaz instructed the correctional officer assigned to Crawford's unit, Sgt. Whitfield, not to let Crawford out of his cell to attend sick call.[62]

---

[57] Ex. 5, Medical Records, at 25; Ex. 9, Prodromos Rpt., at 5; Ex. 1, Complaint ¶¶ 256-265.
[58] Ex. 1, Complaint ¶ 259; Ex. 2, Crawford Decl. ¶ 6.
[59] Ex. 1, Complaint ¶ 105; Ex. 3, Crawford Dep. 32:2-5, 40:20-42:6.
[60] Ex. 4, Grievance Materials, at 3.
[61] Ex. 3, Crawford Dep. 40:20-42:6.
[62] Ex. 1, Complaint ¶¶ 260-263; Ex. 3, Crawford Dep. 40:20-42:6.

March 7, 2022                                    Respectfully submitted,

                                                /s/ *Samuel P. Myler*
                                                Mark McLaughlin
                                                Marc R. Kadish
                                                Samuel P. Myler
                                                MAYER BROWN LLP
                                                71 South Wacker Drive
                                                Chicago, IL 60606-4637
                                                Tel: (312) 782-0600
                                                Fax: (312) 706-8238

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 7, 2022, a copy of the foregoing was filed electronically using the Court's CM/ECF system. Counsel for all parties will receive notice and a copy of the foregoing via the Court's CM/ECF system.

/s/ *Samuel P. Myler*
Attorney for Plaintiff